1
2
3
4
5                          **UNITED STATES DISTRICT COURT**

6                              **DISTRICT OF NEVADA**

7   UNITED STATES OF AMERICA,            )
                                         )        Case No. 2:10-cr-00176-KJD-PAL
8                          Plaintiff,    )
                                         )        <u>**ORDER AND REPORT OF FINDINGS**</u>
9   vs.                                  )            <u>**AND RECOMMENDATION**</u>
                                         )
10  JORDAN WILLIAMS,                     )            (Mtn to Suppress - Dkt. #27)
                                         )
11                         Defendant.    )
                                         )
12  _____)

13          On August 19, 2010, the court held a hearing on Defendant Jordan Williams' Motion to

14  Suppress Evidence Derived Directly and Indirectly from the Search Warrant (Dkt. #27), the

15  government's Opposition (Dkt. #28), Williams' Reply (Dkt. #30), and the government's Surreply (Dkt.

16  #32).  On August 18, 2010, Williams filed a Supplement (Dkt. #38), and the government filed a Motion

17  to Strike the Supplement (Dkt. #39), to which Williams responded (Dkt. #40), and the government

18  replied (Dkt. #41).  The government also filed a Supplement to its Response to the Motion to Strike

19  (Dkt. #42).  Williams filed a Supplemental Brief (Dkt. #45) on August 20, 2010.  The court held

20  continued oral argument on August 26, 2010 and a limited evidentiary hearing August 30, 2010.  The

21  court has considered the foregoing papers and the arguments of counsel made on the record at the

22  hearings.

23                              **BACKGROUND**

24          On April 20, 2010, the grand jury returned an Indictment (Dkt. #1) charging Williams with one

25  count of felon in possession of a firearm and one count of felon in possession of ammunition, in

26  violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2).  Williams and his co-Defendant, Jessica Medina,

27  were arrested on March 3, 2010, after the execution of a search and seizure warrant at 475 Toucan

28  Ridge, Henderson, Nevada.

1    **A.      Motion to Suppress (Dkt. #27).**

2    The current motion seeks to suppress "all evidence directly or indirectly derived from the

3    [s]earch of 475 Toucan Ridge" because the Henderson Police Department made false statements and

4    omissions in the affidavit submitted to the Henderson Justice of the Peace.[1]  Williams also asserts the

5    information submitted to the Justice of the Peace was too stale to support a finding of probable cause.

6    Although Williams asserts he does not reside at 475 Toucan Ridge, he claims he has standing as a

7    frequent overnight guest to contest the search.  Williams requests a hearing pursuant to *Franks v.*

8    *Delaware*, 438 U.S. 154 (1978).  He asserts that the statements of Anna Oustian,[2] who asserted

9    Williams held a gun to her head, were unreliable because no search warrant for 475 Toucan Ridge was

10   obtained until March 2010.  Further, because Henderson Police waited so long to use Ms. Oustian's

11   statements, the warrant was issued based on stale information.  He argues that the affiant, Detective

12   Purdue, misled the Justice of the Peace who issued the warrant by stating he had intelligence that

13   several of the women within the residence were prostitutes, and this is untrue.

14   In response, the government agrees that Williams has standing to object to the search of 475

15   Toucan Ridge.  However, the government argues that Williams is not entitled to a *Franks* hearing

16   because he has not shown that the affidavit supporting the search warrant contained any intentional or

17   recklessly made false or misleading statements or omissions.  Assuming *arguendo* Williams had made

18   such a showing, the government asserts the affidavit provided the reviewing magistrate with probable

19   cause to justify the search because it contained the following facts: (a) there was a search of 475 Toucan

20   Ridge in 2006 in which 331 grams of marijuana was discovered[3]; (b) in an August 2009 interview with

21

22

23   [1]The parties initially disputed who authorized the search and seizure warrant.  Williams stated that it was Justice of the Peace Stephen George; the government asserted that it was Judge Burr.  An executed copy of the search warrant and search warrant return was not obtained until August 19, 2010.

24   *See* Dkt. 42.  It reflects that Judge Burr was the issuing Judge.

25

26   [2]Throughout their papers, the parties refer to her as Anna Oustain.  However, during her video interview she spelled her name "Oustian."

27

28   [3]The affidavit actually refers to an August 18, 2006 search at a residence at 2025 Troon Drive in Henderson, Nevada which was the residence of the Defendant, Jordan Williams, at that time.

Ms. Oustian, Oustian claimed she had been a resident in the house until just days before, and left after Defendant pointed a loaded handgun at her head and threatened to kill her; Oustian also told HPD that she had been a prostitute working for Williams from 2007 until she left in August 2009, and that Williams smokes large amounts of marijuana and keeps it at the residence, generally in the kitchen area[4]; and (c) on February 22, 2010, Henderson Police visited 475 Toucan Ridge and smelled a strong odor of marijuana emanating from the house, and an individual in the home told officers that people had been smoking marijuana in the house moments before.  The government also asserts that Williams has not made any detailed offers of proof to accompany his allegations Detective Purdue's affidavit contained false or misleading statements.

Willliams' reply reiterates that he has standing to contest the search as a frequent overnight guest, although Williams denies he is a resident of 475 Toucan Ridge.  Williams also argues that the government's response contains a number of assumptions and factual inaccuracies.  Additionally, Williams claims that the government has not provided a reasonable explanation concerning why the Henderson Police Department did not act on Oustian's claim that Williams held a gun to her head six months earlier.  Counsel for Williams claims that a *Franks* hearing is required because the affidavit supporting the search warrant is filled with dubious information that was not verified, and there was nothing in the warrant to support a finding of probable cause that Williams was involved in distributing marijuana.  He requests an evidentiary hearing "to determine if Detective Purdue was acting recklessly in presenting his affidavit for a nighttime search warrant to the Henderson Justice of the Peace."

Williams filed a supplement (Dkt. #38) attaching Oustian's videotaped interview to support his claims that Detective Purdue misled Judge Burr.  In oral argument, counsel for Williams asserted that the videotape of the interview contradicts Detective Purdue's affidavit.  Specifically, Oustian stated in her videotaped interview that Williams put a gun to her head in 2007, but Detective Purdue's affidavit suggests the incident occurred in August 2009.

---

[4]There are numerous errors in the government's summary of the paragraph of Detective Purdue's affidavit that outlines his interview of Ms. Oustian.  For example, Purdue's affidavit does <u>not</u> say Oustian left the residence at 475 Toucan days before the interview after Williams pointed a loaded gun to her head.

1        **B.      Motion to Strike (Dkt. #39).**

2        The government filed a motion to strike Williams' supplement on the grounds the Oustian

3   interview was not presented to or considered by Jude Burr in issuing the search warrant.  The

4   government claims the interview is also irrelevant to this court's determination of whether the search

5   warrant is supported by probable cause.  Williams responds that he submitted the videotaped interview

6   to support his claims Purdue made recklessly false or misleading statements to Judge Burr.  Oustian's

7   interview reflects that she did not suggest Williams was selling narcotics from 475 Toucan Ridge.

8   Additionally, Oustian told Henderson police that the gun incident occurred in 2007, not August 2009.

9   The government is correct that this court may not consider information not presented to the issuing

10   judge to determine whether there was probable cause for the warrant.  However, counsel for Williams

11   supplemented his motion papers with the interview to support his position Detective Purdue made false

12   or misleading statements to obtain the warrant.  The court has reviewed the videotape of Oustian's

13   interview to determine whether Williams has met his threshold burden of showing he is entitled to a

14   *Franks* hearing.  The government's Motion to Strike (Dkt. #39) is therefore **DENIED**.

15        **C.      Procedural History**

16        As an initial matter, neither the government nor the Defendant had a signed copy of the search

17   warrant at issue in this case, or its return.  The court directed counsel for the government to obtain an

18   authenticated executed copy of the application and warrant signed by the issuing judge.  The

19   government filed a supplement (Dkt. #42) August 19, 2010 attaching a certified copy of the application

20   and affidavit for search warrant signed by Judge Burr.  The search warrant itself, signed by Judge Burr,

21   and the Henderson Police Department search warrant return filed with the Henderson Justice Court.

22   The court compared the application and affidavit for search warrant attached to Williams' motion to

23   suppress with the certified copy submitted by the government in its supplement (Dkt. #42), and found

24   that they were not identical.

25        The unexecuted copy of the search warrant attached to Williams' motion to suppress (which the

26   government produced to counsel for Williams in discovery) contained three lines which were not in the

27   certified copy of the search warrant filed by the government in its supplement (Dkt. #42).  The court set

28   an evidentiary hearing on August 30, 2010 for the limited purpose of taking testimony to explain the

4

1   disparity.  At the evidentiary hearing, Detective Purdue testified that he prepared the application and

2   affidavit for search warrant on his work computer and printed it out.  When he printed the document

3   out, the place for the judge's name and signature was at the top of a blank page.  He knew from

4   experience that the judge would not sign a blank page and reformatted the document to ensure there

5   was text on the last page where the judge's signature would be placed.  After he reformatted the

6   document, he reprinted the last several pages of the affidavit rather than the entire document.

7           Detective Purdue compared the version of the search warrant application and affidavit produced

8   to the government in discovery in this case with the executed and certified copy on file with the

9   Henderson Justice Court.  In doing so, he determined that three lines in the original version of the

10  application were inadvertently omitted when the document was reformatted and reprinted.  Specifically,

11  the lines "Due to the fact that prohibited persons, such as convicted felons, cannot legally purchase or

12  sell firearms though legitimate commerce, your Affiant knows from experience and training that

13  firearms become extremely valuable possessions" were deleted from the affidavit submitted to Judge

14  Burr.  He did not discover this error until it was brought to his attention when the court set this matter

15  for hearing.

16          As the lines quoted above were not included in the application and affidavit submitted to Judge

17  Burr, this court may not consider the information contained in these lines in determining whether the

18  search warrant stated probable cause.  However, the court found Detective Purdue credible about his

19  explanation concerning the discrepancy between the unsigned version of the search warrant produced in

20  discovery in this case, and the authenticated copy obtained from Henderson Justice Court.  A

21  comparison of the two documents also supports his testimony.

22                                                   **DISCUSSION**

23          The Fourth Amendment secures "the right of the people to be secure in their persons, houses,

24  papers, and effects against unreasonable searches and seizures."  U.S. Const. Amend. IV.  The Fourth

25  Amendment protects reasonable and legitimate expectations of privacy.  *Katz v. United States*, 389 U.S.

26  347 (1967).  The Fourth Amendment protects "people not places."  *Id*.  Evidence obtained in violation

27  of the Fourth Amendment, and evidence derived from it may be suppressed as the "fruit of the

28  poisonous tree."  *Wong Sun v. United States*, 371 U.S. 471 (1963).

A. **Capacity to Claim Fourth Amendment Violation.**

A person must have a reasonable expectation of privacy in the place searched to claim a violation of his or her Fourth Amendment rights.  The Supreme Court has enunciated a two-part test to determine whether an expectation of privacy is reasonable and legitimate.  *See Katz*, 389 U.S. at 361.  First, the individual must have an actual subjective expectation of privacy, and second, society must recognize that expectation as objectively reasonable.  *Id*.

The Supreme Court has held that the "capacity to claim the protection of the Fourth Amendment depends . . . upon whether the person who claims the protection of the Amendment has a legitimate expectation of privacy in the invaded place."  *Minnesota v. Olson*, 495 U.S. 91, 95 (1990) (*citing Katz v. United States*, 389 U.S. 347 (1967); *Rakas v. Illinois*, 439 U.S. 128, 143 (1978)).  In order to have "standing" to contest the legality of a search or seizure, a defendant must establish that he had a subjective expectation of privacy in the place searched, an expectation society accepts as objectively reasonable.  *Minnesota v. Carter*, 525 U.S. 83, 87-88 (1998) (*citing Rakas*, 439 U.S. at 143-44 & n.12).  The defendant bears the burden of establishing, under the totality of the circumstances, that "the search or seizure violated his legitimate expectation of privacy in a particular place."  *United States v. Davis*, 932 F.2d 752, 756 (9th Cir. 1991) (*citing Rawlings v. Kentucky*, 448 U.S. 98, 104 (1980)); *see also United States v. Singleton*, 987 F.2d 1444, 1449 (9th Cir. 1993).  It is well-established that an overnight guest has a legitimate expectation of privacy in the host's home that the Fourth Amendment protects.  *Olson*, 495 U.S. at 96-97; *United States v. Davis*, 332 F.3d 1163, 1167 (9th Cir. 2003)*; United States v. Robertson*, 606 F.2d 853, 858 n.2 (9th Cir. 1979).

The parties dispute whether Williams lived at 475 Toucan Ridge, but do not dispute that he was a frequent overnight guest who slept in the master bedroom.  As an overnight guest, he has standing to challenge this search.

B. ***Franks* Hearing.**

Williams seeks an evidentiary hearing to determine if Detective Purdue's affidavit supporting this search warrant contains intentionally or recklessly false statements.  He argues that because the officers did not act on Oustian's claim that Williams put a gun to her head in the six months before the search warrant was issued, that Purdue could not have believed her claims.  He also argues Purdue

6

misled Judge Burr with claims that he had intelligence that females located in the residence were prostitutes. Finally, he appears to ask for a *Franks* hearing to explore whether the information provided in the search warrant was too stale to support a finding of probable cause.

In *Franks v. Delaware*, 438 U.S. 154 (1978), the Supreme Court addressed at length whether a false statement by a government affiant invalidates a search warrant. *United States v. Hammett*, 236 F.3d 1054, 1058 (9th Cir. 2001). In *Franks*, the Court held that a defendant could challenge a facially valid affidavit by making a substantial preliminary showing that: (1) the affidavit contains intentionally or recklessly false statements; and (2) the affidavit purged of its falsities would not be sufficient to support a finding of probable cause. *See United States v. Craighead,* 539 F.3d 1073, 1080 (9th Cir. 2008); *United States v. Martinez-Garcia*, 397 F.3d 1205, 1215 (9th Cir. 2005) (*citing Franks*, 438 U.S. at 155-56); *United States v. Lefkowitz*, 618 F.2d 1313, 1317 (9th Cir.), *cert. denied*, 449 U.S. 824 (1980)*; see also United States v. Stanert*, 762 F.2d 775, 780 (9th Cir. 1985). To be entitled to a *Franks* hearing, "[t]here must be allegations of deliberate falsehood or reckless disregard for the truth, and these allegations must be accompanied by an offer of proof." *Craighead,* 539 F.3d at 1080; *Hammett*, 236 F.3d at 1058 (*quoting Franks*, 438 U.S. at 171). Where the defendant makes such a showing, the Fourth Amendment requires that a hearing be held at the defendant's request. *Franks*, 438 U.S. at 155-56; *Stanert*, 762 F.2d at 780.

The court finds Williams has not made a substantial showing that Detective Purdue's affidavit contains intentionally or recklessly false statements to entitle him to a *Franks* hearing. The court has reviewed the affidavit submitted to Judge Burr, and the videotaped interview of Ms. Oustian which Williams asserts is evidence that Purdue made false or misleading statements, and finds that his arguments are not well taken.

First, Williams claims that Detective Purdue misled Judge Burr by claiming he had information that women living at 475 Toucan Ridge were prostitutes. Detective Purdue's affidavit indicates Oustian "advised that she was a former prostitute and that she was being 'pimped' by Jordan Williams from the year 2007 to 08/2009." The court has reviewed Oustian's video and audio recorded interview. Oustian stated she lived and worked for Jordan at various times between 2007 through 2009. During part of the time, she and other women lived with Jordan at a residence in the Roma Hills subdivision in

1    Henderson, and then later at 475 Toucan Ridge.  During her interview she stated she initially worked

2    for Jordan by performing in a pornographic video he shot.  She also worked at a strip club and turned

3    over her earnings to Williams.  On one occasion while she lived with Williams, she acted as a prostitute

4    and turned over her earnings to Williams.  Williams beat her up for talking to another pimp which led

5    Oustian to conclude that he was a pimp.  Detective Purdue's affidavit correctly reflects that Oustian

6    reported she was a former prostitute.  His affidavit also stated that Oustian claimed she was being

7    "pimped" by Williams between 2007 and August 2009.  It does not describe what he means by the use

8    of the term.  However, after listening to the interview in its entirety, the court does not find this

9    characterization is false or misleading.

10        Next, Williams claims that Detective Purdue misled Judge Burr by stating in his affidavit that

11    Oustian was threatened with a loaded handgun in August 2009, when, in fact, the incident occurred in

12    2007.  Detective Purdue's affidavit contains a paragraph which summarizes his interview with Oustian.

13    With respect to the loaded gun incident, the affidavit states: "Oustian advised Jordan Williams was

14    physically abusive towards her while she lived with him.  That Jordan Williams has pointed a gun at her

15    head and told her that he could eliminate her if he wanted to."  Oustian stated in her interview that

16    Williams hit and slapped her on multiple occasions.  She stated on one occasion, Williams pointed a

17    gun at her head and told her he could get rid of her if he wanted to.  She also said Williams had

18    threatened to kill her and her family.  Contrary to Williams' assertion, the affidavit provided to Judge

19    Burr did not state that the loaded gun incident occurred in 2009.  Rather, a fair reading of the affidavit

20    indicated that Oustian informed Purdue that Williams was abusive to her while she lived with him

21    during 2007 through August 2009, and on one occasion, pointed a gun at her head.  Detective Purdue's

22    summary was consistent with Oustian's interview statement.

23        Williams also argues Purdue misled Judge Burr by stating in his affidavit that he had

24    intelligence that females located in the 475 Toucan residence were prostitutes.  On this subject, the

25    affidavit states: "It should be noted that your Affiant has provided intelligence information to several

26    officers working in this area of the City of Henderson, that information had been obtained that the

27    residence at 475 Toucan Ridge, Henderson, Nevada 89012, were possibly involved in acts of

28    prostitution and pandering."  Williams' Motion argues that this is a false statement because "[n]ot a

8

single woman in the residence have [sic] any prior arrests or interactions with law enforcement.  All of these woman [sic] who do work in adult nightclub businesses have legitimate Clark County Sheriff's Office work cards.  This detective had not [sic] information that would suggest that any of these women were prostitutes."  Motion, Dkt. #27 6:13-18.  The motion does not reveal the basis for counsel for Defendant's representations.  However, even if counsel for Williams has some evidence that the women in the residence did not have prior arrests, worked in adult nightclub businesses and had Clark County Sheriff's Office work cards, this does not establish that Detective Purdue misled or provided false information to Judge Burr when he stated he had "intelligence" residents of 475 Toucan Ridge were "possibly involved in acts of prostitution and pandering."

Finally, Williams appears to argue that the affidavit is misleading because it sought permission to search "because of the possibility that marijuana may be present in the residence."  He cites portions of Detective Purdue's affidavit that relate to the February 2010 investigation conducted by other Henderson Police Department officers who responded to a call from Jim Sam.  The court has a hard time following this argument.  Purdue's affidavit contains a paragraph indicating that on February 22, 2010, two Henderson Police Department officers were dispatched to speak with Jim Sam.  Mr. Sam told the officers that his daughter, Michelle Sam, was looking for a job on Craig's List and was going to 475 Toucan Ridge for an interview and would be staying overnight at the residence.  Sam told officers that he was suspicious and believed it involved narcotics or prostitution.  Sam tried to go to 475 Toucan Ridge, but was stopped by a security officer at the gate.  Sam told the guard about his concern for his daughter, but was denied entrance.  The guard reportedly told Sam, "there are always a lot of females coming and going out of that residence."  Henderson Officers Little and Paul went to 475 Toucan Ridge to investigate Sam's concerns.  While at the residence, the officers smelled marijuana, and were told by Sam's daughter, Michelle Sam, that people were smoking marijuana inside.  However, Officer Little told Purdue "he did not act on the crime of marijuana being in the residence" because Little was aware of Purdue's investigation at the residence and did not wish to jeopardize it.

The motion to suppress asks the rhetorical question why the officers investigating this incident did not get a warrant for the marijuana at that time.  First, asking this rhetorical question does not meet Williams' burden of establishing the statement is false or misleading.  Second, the affidavit provides

1  the answer.  The investigating officers did not act on marijuana being in the residence because Little

2  was aware of Purdue's investigation and did not want to jeopardize it.

3         Nothing in Oustian's tape-recorded interview contradicts Detective Purdue's affidavit statement.

4  Oustian clearly stated that Williams smoked marijuana and bought a "four to five finger" bag everyday.

5  Oustian also said Williams kept ecstacy and cocaine in the residence.  Additionally, nothing in

6  Oustian's tape recorded interview contradicts Detective Purdue's summary of the February 22, 2010

7  investigation conducted by other Henderson Police Department officers.  In short, the court finds

8  Williams is not entitled to a *Franks* hearing because he has not made an offer of proof or other

9  substantial showing that false or misleading information was presented to Judge Burr in the affidavit

10 supporting the search warrant.

11        **C.    Probable Cause.**

12        Williams also asserts that because there was a six-month lapse of time between Ms. Oustian's

13 interview and the execution of the warrant, the information she provided was stale and could not be

14 used to support a finding of probable cause.  Probable cause is required to justify certain governmental

15 intrusions upon interests protected by the Fourth Amendment.  *See Ornelas v. United States*, 517 U.S.

16 690, 695 (1996); *Illinois v. Gates*, 462 U.S. 213, 241 (1983).  Probable cause to search exists when

17 there is "a fair probability that contraband or evidence of a crime will be found in a particular place,"

18 *i.e.,* the place to be searched.  *Gates,* 462 U.S at 238.  "Whether there is a fair probability depends upon

19 the totality of the circumstances, including reasonable inferences, and is a 'common sense, practical

20 question.'" *United States v. Kelley*, 482 F.3d 1047 (9th Cir. 2007) (*citing United States v. Gourde*, 440

21 F.3d 1065, 1069 (9th Cir. 2006) (*en banc*)).

22        A determination of whether probable cause exists is made by examining the totality of the

23 circumstances.  *Gates,* 462 U.S. at 241.  The Supreme Court has repeatedly emphasized that the

24 probable cause standard is a "practical, non-technical conception."  *Brinegar v. United States,*

25 338 U.S. 160, 176 (1949).  A probable cause determination is two-fold.  First, a court must determine

26 "historical facts," that is, the events leading up to the stop or search.  *Ornelas,* 517 U.S. at 696.  Second,

27 the court must determine "whether those historical facts, viewed from the standpoint of a reasonable

28 police officer," amount to probable cause.  A judge's decision regarding probable cause should be given

1   great deference. *Id.* at 698-99. The duty of a reviewing court is to ensure that the magistrate had a

2   substantial basis for concluding that probable cause existed. *Id.; see also United States v. Neilsen,*

3   371 F.3d 574, 579 (9th Cir. 2004). A reviewing court is required to examine all the circumstances set

4   forth in the affidavit, and in doubtful cases, to give preference to the validity of the warrant. *United*

5   *States v. Peacock,* 761 F.2d 1313, 1315 (9th Cir. 1985), *cert. denied,* 474 U.S. 874 (1985).

6       Facts supporting probable cause can come from several sources, including the observations of

7   law enforcement who use their expertise and training to draw inferences of criminal activity from

8   behavior that is not criminal on its face. *See, e.g., Alford v. Haner,* 446 F.3d 935, 937 (9th Cir. 2006)

9   (probable cause to arrest for impersonating officer where police observed police radio, scanner, and

10  handcuffs in car). Law enforcement can also use facts ascertained from a confidential informant. *See,*

11  *e.g., United States v. Reeves,* 210 F.3d 1041, 1045-46 (9th Cir. 2000) (probable cause for search warrant

12  even though informant had criminal record because informant had previously provided reliable

13  information). Moreover, a "magistrate may rely on the conclusion of experienced law enforcement

14  officers regarding where evidence of a crime is likely to be found." *United States v. Fannin,*

15  817 F.2d 1379, 1381 (9th Cir. 1987). An officer need not include all information in his possession to

16  obtain a search warrant, but instead, need only show facts adequate to support a finding of probable

17  cause. *United States v. Johns,* 948 F.2d 599, 605 (9th Cir. 1991). "Trustworthy information" must be

18  used to support a probable cause determination and can include a tip from an informant so long as the

19  tip is reliable. *See Gates,* 462 U.S. at 283. Reliability may be shown by the informant's past record of

20  reliability, through independent confirmation, personal observation by law enforcement, or other means.

21  *See Alabama v. White*, 496 U.S. 325 (1995).

22      When a search warrant is based solely on an informant's tip, the "proper analysis is whether

23  probable cause exists from the totality of the circumstances to determine a sufficient level of reliability

24  and basis of knowledge for the tip." *United States v. Bishop,* 264 F.3d 919, 924 (*citing Gates,* 462 U.S.

25  at 238). One of the factors that courts consider is the informant's basis of knowledge – that is "how

26  the informant came by his or her knowledge." *Id.* at 925 (*citing United States v. Angulo-Lopez,*

27  791 F.2d 1394, 1396 (9th Cir. 1986)). In *Bishop,* the Ninth Circuit found that because the informant

28  had first-hand knowledge that the defendant had "cooked" methamphetamine the day before the

application for the search warrant was made, the informant's tip was more reliable. "The veracity of an informant's information is also considered when reviewing the totality of the circumstances." *Id.* at 925. A court may find an informant's information is reliable based on independent police corroboration of the information provided by an informant. *Id. (citing United States v. Freitas*, 716 F.2d 1216, 1222 (9th Cir. 1983)). A court may also consider whether an informant's information is an admission against penal interest in evaluating the reliability of the informant's information. *Id. (citing United States v. Harris,* 403 U.S. 573, 583-84 (1971)).

An affidavit supporting a search warrant establishes probable cause if it contains sufficient facts to justify a conclusion that the property which is the object of the search is probably on the premises to be searched at the time the warrant is issued. *United States v. Hendricks*, 743 F.2d 653, 654 (9th Cir. 1984) (*quoting Durham v. United States*, 403 F.2d 190, 193 (9th Cir. 1968)), *cert. denied*, 470 U.S. 106 (1985). "It is well-established that a location can be searched for evidence of a crime even if there is no probable cause to arrest the person at that location." *United States v. Hay*, 231 F.3d 630, 635 (9th Cir. 2000), *citing Zurcher v. The Stanford Daily*, 436 U.S. 547, 546 (1978). Thus, for Fourth Amendment purposes, it is not necessary to show that the owner of the property is suspected of a crime, only that there is probable cause to believe that the specific things to be searched for and seized are located in the searched premises. *Id.*

Williams argues that Detective Purdue did not really believe Oustian because he did not act on her information earlier, and that the information in the affidavit is too stale to support a finding of probable cause. The Ninth Circuit has made it clear that courts are to evaluate staleness in light of the particular facts of the case and the nature of the criminal activity and property sought. *United States v. Pitts*, 6 F.3d 1366, 1369 (9th Cir. 1993) (internal quotation omitted).

It is well-established that when a search warrant seeks evidence of an ongoing criminal business "greater lapses of time are permitted if the evidence in the affidavit shows the probable existence of an activity at an earlier time." *United States v. Greany*, 929 F.2d 523, 525 (9th Cir. 1991); *see also United States v. Dozier*, 844 F.2d 701, 707 (9th Cir.), *cert. denied,* 488 U.S. 927 (1988) ("the mere lapse of substantial amounts of time is not controlling in a question of staleness"). Information offered to support a search warrant is not stale if "there is sufficient basis to believe, based on continuing pattern

or other good reasons, that the items to be seized are still on the premises." *United States v. Lacy*, 119 F.3d 742, 746 (9th Cir. 1997), *cert. denied*, 118 S.Ct. 1571 (1998) (*quoting United States v. Gann,* 732 F.2d 714, 722 (9th Cir. 1984)).  For example, when an affidavit establishes the existence of a wide-spread, entrenched and ongoing narcotics operation "staleness arguments lose much of their force." *United States v. Hernandez-Escarsega*, 886 F.2d 1560, 1566 (9th Cir. 1989).  For this reason, in *United States v. Leasure*, 319 F.3d 1092, 1099 (9th Cir. 2003), the Ninth Circuit held that a warrant was not stale because some of the information on which it was based was discovered six months earlier.

More recent information can also "freshen" stale information.  *See United States v. Collins*, 61 F.3d 1379, 1384 (9th Cir. 1995) (*citing United States v. Vaandering*, 50 F.3d 696, 700 (9th Cir. 1995)). In *Vaandering*, the Ninth Circuit concluded that information twenty-two months old was not stale considered in light of other, more recent information in the affidavit.  In *Collins,* the Ninth Circuit rejected a defendant's argument that information that the defendant possessed firearms was too stale to support a finding of probable cause.  The affidavit supporting the search warrant indicated that, in an earlier police investigation, the defendant had admitted to police that he had possessed firearms.  Police investigation revealed the defendant had numerous felony convictions and two outstanding warrants for his arrest.  Additionally, an acquaintance of the defendant, whom police found reliable, reported that firearms were in the defendant's residence approximately six weeks before the affidavit was signed by the affiant.  The court concluded that, because the acquaintance's tip was based on personal observation and corroborated in part by the defendant's earlier admission that he owned firearms, the information was not too stale to support a finding of probable cause.

The court concluded that the tip from the acquaintance that Collins had firearms in his home within six weeks of the search updated older information regarding his possession of firearms in 1993. Thus, it was not unreasonable for the issuing judge to conclude there was a fair probability that firearms would be found at the defendant's residence.  Citing decisions in other circuits, the Ninth Circuit reasoned that firearms are durable guns that are useful to their owners for long periods of time.  *Id.* at 384.  *See also United States v. Singer*, 943 F.2d 758, 763 (7th Cir. 1991) (upholding no-knock entry based on six month old report that defendant had a hand gun, reasoning that "firearms, unlike drugs, are durable goods useful to their owners for long periods of time."); *United States v. Batchelder*, 824 F.2d

563, 564-65 (7th Cir. 1987) (nine-month old information that defendant purchased illegal silencer parts for pistol not stale); *United States v. Miles*, 772 F.2d 613, 616 (10th Cir. 1985) (two-and-a-half-week old information regarding defendant's possession of stolen firearms is not stale).

In *United States v. Crews*, 502 F.3d 1130 (9th. Cir. 2007), the Ninth Circuit found that information in an affidavit supporting a search warrant that a defendant possessed a firearm twelve days before the execution of the search warrant was not stale. Twelve days before the search warrant was executed, a police officer attempted to pull the defendant over for a traffic infraction. The defendant, a convicted felon, increased his speed, jumped from the vehicle, and tried to elude the police. After a brief foot pursuit, the officers arrested him. A sweep of the area located a .22 caliber revolver under some shrubbery. The Ninth Circuit found "it is reasonable to believe that ammunition, cleaning kits, cases, and other evidence of firearm possession would have still been present" at the defendant's apartment even if he had discarded the revolver. This is because, "one may infer that equipment acquired to accomplish a crime will be kept for some period of time." *Id. citing United States v. Hernandez,* 80 F.3d 1253, 1959 (9th Cir. 1996), overruled on other grounds *Muscarello v. United States*, 524 U.S. 125 (1998).

### D.   The "Good Faith" Exception.

In *United States v. Leon*, 468 U.S. 897, 925 (1984), the United States Supreme Court established an exception to the exclusionary rule for a search conducted in good faith reliance upon an objectively reasonable search warrant. The Supreme Court held that the exclusionary rule should not bar evidence obtained by officers acting in reasonable reliance on a search warrant issued by a detached and neutral magistrate, but ultimately found to be unsupported by probable cause. Adopting a good faith reliance test, the Supreme Court reasoned that the rationale for the Fourth Amendment exclusionary rule was to deter unlawful *police* conduct. If, after reviewing an affidavit and application for a search warrant, an issuing judge incorrectly concludes the affidavit states probable cause, the mistake is made by the judge not the police officer. The court's prior precedents had held that the exclusionary rule's "primary purpose is to deter future unlawful police conduct, and therefore effectuate the guarantee of the Fourth Amendment against unreasonable searches and seizures." *United States v. Calandra*, 414 U.S. 338, 347 (1974). In *Leon*, the Supreme Court recognized that, if an officer is acting

14

1    as a reasonable officer would and should act in similar circumstances, that excluding evidence "can in

2    no way affect his conduct unless it is to make him less willing to do his duty."  468 U.S. at 920.

3          The Supreme Court has emphasized that lower courts should apply the exclusionary rule

4    pragmatically, balancing the costs of excluding evidence with the benefits of deterring overreaching by

5    law enforcement officers.  *See Illinois v. Krull*, 480 U.S. 340, 347 (1987).  The Supreme Court has also

6    held that courts have the discretion to determine whether the good faith reliance exception applies

7    before determining whether a search warrant application and affidavit are supported by probable cause.

8    *Leon* at 923-25.  The Ninth Circuit has recognized that "[f]or the good faith reliance exception to apply,

9    the officers must have relied on the search warrant in an objectively reasonable manner."  *Crews*, 502

10   F.3d at 1136, *citing Untied States v. Clark,* 31 F.3d 831, 835 (9th Cir. 1984).  The affidavit supporting

11   the search warrant must at least establish a colorable argument for probable cause for the good faith

12   exception to apply.  *Id. citing United States v. Luong,* 470 F.3d 898, 903 (9th Cir. 2006).  Therefore, the

13   evidence seized in the search of 475 Toucan is admissible if there is a colorable argument that the

14   search warrant was supported by probable cause because, if so, Detective Purdue's reliance on the

15   search warrant was objectively reasonable.  A determination that the search warrant was objectively

16   reasonable "ends the inquiry without having to belabor the issue of whether the affidavit stated probable

17   cause."  *Id.*

18         *Leon* recognized four exceptions in which the good faith exception does not apply because

19   reliance is, *per se*, unreasonable.  They include: (1) where the issuing magistrate was misled by

20   information in the affidavit which was knowingly or recklessly false; (2) where the issuing magistrate

21   had abandoned the detached and neutral judicial role; (3) where the affidavit was so lacking in probable

22   cause as to render official belief in its existence entirely unreasonable; or (4) where the warrant is so

23   facially deficient in failing to particularize the place to be searched or things to be seized that the

24   executing officers could not reasonably presume it to be valid.

25         The court has found that Williams has not established that Detective Purdue misled Judge Burr

26   by making any false statement or that he recklessly disregarded the truth in making any statement

27   contained in the affidavit.  Williams does not claim that Judge Burr abandoned his detached and neutral

28   judicial role, or that the affidavit was so lacking in probable cause to render official belief in its

1    existence unreasonable, or that the warrant failed to particularize the place to be searched or things to be

2    seized.

3        For the reasons below, the court finds the good faith reliance exception applies for the search

4    warrant's authorization to search the 475 Toucan Ridge residence for evidence of the offense of ex-

5    felon in possession of a firearm.  There is at least a colorable argument to support a finding of probable

6    cause that the residence contained firearms.  However, there is not a colorable argument that the search

7    warrant is supported by probable cause to believe evidence of possession of a controlled substance **with**

8    **intent to sell** would be found in the searched premises.  The officers' reliance on the search warrant to

9    obtain evidence of firearms, ammunition and related evidence was objectively reasonable.  The officers'

10   reliance on the search warrant to seize evidence of possession of a controlled substance for intent to sell

11   was not.  Applying the doctrine of severance, the court will recommend that only those articles seized

12   pursuant to the invalid portions of the warrant need to be suppressed.

13       The application and affidavit for the search warrant in this case was extremely broad in seeking

14   authorization for the property sought to be searched for and seized.  Detective Purdue applied for and

15   received authorization to search for and seize marijuana; paraphernalia commonly associated with the

16   ingestion and distribution of cocaine and marijuana; documents, photographs, notes, papers, records (in

17   digital or printed form) to establish the identity of occupants, owners and residents or frequent visitors

18   having a possessory interest in the search premises; U.S. currency believed to be proceeds from the sale

19   of narcotics; firearms, firearm related documents such as registration cards, instruction manuals,

20   containers, cleaning or maintenance items, ammunition and registration information; locked containers;

21   forensic processing to conduct a thorough investigation; documents, video recordings, maps, diagrams,

22   phone records to clarify and/or establish the identity and relationships of persons connected to the

23   investigation; documentary items establishing ownership or occupancy of the searched premises; and to

24   search persons encountered at the search premises.  It also sought authorization to search for and seize

25   all computer hardware, computer software, computer related documentation, computer passwords and

26   data security devices, and any device making and receiving phone calls.  With respect to the computer

27   and electronic storage devices, the search warrant sought authorization to remove them from the

28   ///

16

searched premises for future forensic examination for a "significant amount of time", *i.e.* six months to a year.

Detective Purdue's application and affidavit offers the following facts to support a finding of probable cause:

(a)    On August 18, 2006, HPD responded to a 911 call for service at Jordan Williams' residence at 2025 Troon Drive in Henderson. A search warrant was obtained which recovered 331 grams of marijuana, narcotics packaging materials, a digital scale, boxes of human growth hormone, vials of what was believed to be steroids, and a stolen loaded firearm. Williams was arrested for felon in possession of a firearm, possession of a stolen firearm, and possession of a controlled substance with intent to sell.

(b)    On August 21, 2009, Purdue conducted a video and audio interview of Anna Oustian who said she was a former prostitute being "pimped" by the Defendant between 2007 and August 2009. Oustian lived with Williams and other females at a residence in Roma Hills in Henderson, and later at a residence at 475 Toucan Ridge. Oustian said Williams smokes a large amount of marijuana at the Toucan Ridge residence. The marijuana is generally located in the kitchen. Oustian said cocaine and ecstacy was in the residence in smaller quantities. Williams was physically abusive towards Oustian while she lived with him, pointed a gun at her head and told her he could eliminate her if he wanted to. Williams had a revolver firearm he keeps in the dresser next to his bed and two or three other firearms in the Toucan Ridge residence.

(c)    On February 22, 2010, HPD officers spoke with Jim Sam, who called about his daughter, Michelle. Michelle Sam was looking for a job and responded to an add on Craig's List. She intended to interview and stay the night at 475 Toucan Ridge. Jim Sam was concerned narcotics or prostitution might be involved and attempted to go to the residence, but was stopped by a security officer at the gate. The guard told Sam "there are always a lot of females coming and going out of the residence."

(d)    Purdue had provided intelligence information to HPD officers that residents at 475 Toucan Ridge "were possibly involved in the acts of prostitution and pandering", and that there was "information narcotics were in the residence". HPD Officer Little responded to a call for service there and made contact with Jordan Williams and Jessica Medina.

(e)    HPD Officers Little and Paul went to 475 Toucan Ridge to investigate Jim Sam's concerns. They knocked on the door and Jessica Medina walked out onto a second floor balcony to speak with officers five minutes later. Medina was asked to come to the front door. Officers smelled a strong odor of marijuana emanating from the residence. Officer Little spoke with Michelle Sam who said people were smoking marijuana inside the residence. Sam went back into the residence and came out indicating Jordan Williams was kicking her out of the residence because he did not need the police there. Officers "did not act on the crime of marijuana" because Officer Little was aware of Purdue's investigation and did not want to jeopardize it.

(f)    Purdue conducted a criminal records check on Williams who had several aliases. His criminal history included five felony convictions, two misdemeanor theft

17

related convictions, and two arrests with unknown dispositions.  Among his arrests was a 2007 Nevada conviction for possession of a controlled substance with intent to sell.

     (g)    Williams "has demonstrated a pattern of possession marijuana".  Oustian's statements about marijuana in the residence along with HPD Officers Little and Paul's observation of the odor of marijuana in the residence confirmed Oustian's statements about marijuana.  Therefore, Purdue believed Oustian's statement that firearms were also in the residence.

In addition to these facts, Detective Purdue provided information, based on his training and experience, "to assist and clarify the types of evidence sought after in this search warrant and its evidentiary value".  He also explained "why certain search procedures should be allowed."  Four of these paragraphs pertain to evidence of narcotics trafficking.  One paragraph described why the officer sought authorization to search persons located at the premises at the time of execution of the warrant.  Two paragraphs related Detective Purdue's training and experience concerning possession of firearms and related accessories and items by prohibited persons.

With respect to possession of firearms and related devices, Detective Purdue related his experience and training that "prohibited subjects" tend to keep coveted firearms for long periods of time and tend to collect accessories for firearms including holsters, cleaning kits, extra magazines and firearm parts.  He also stated, based on his training and experience, that persons who possess firearms frequently conceal or maintain them inside locked or concealed containers, safes and fire safes that require keys or combinations.

Detective Purdue also requested authorization for nighttime execution of the warrant on various grounds including, that in 2006, Williams was arrested for narcotics sales while in possession of a stolen firearm and that Oustian observed firearms in the residence during August 2009.  Additionally, Willliams was a trained martial arts fighter and allowing a nighttime search would allow officers to make an undetected approach to afford additional safety to the occupants and officers executing the warrant.

The court finds Detective Purdue had a colorable basis to search the residence at 475 Toucan Ridge for firearms, firearms accessories and ammunition.  Additionally, it was objectively reasonable for officers to seize documents evidencing ownership or possession of firearms and accessories as well as documents evidencing ownership, occupancy, or a possessory interest in the search premises.  The

affidavit established that, in August 2006, Jordan Williams was arrested for possession of a controlled substance with intent to sell, possession of a stolen, loaded firearm, and possession of a firearm by an ex-felon.  Oustian told Purdue in a video and audio recorded interview in August 2009 that Williams kept a firearm in the dresser next to his bed, and two or three other firearms in the residence at 475 Toucan Ridge.  Oustian also told officers that Williams and other females lived in the 475 Toucan Ridge residence.  Other Henderson Police Departments had responded to a call for service at 475 Toucan Ridge in which they had made contact with Williams and Jessica Medina.  On February 22, 2010, HPD officers went to 475 Toucan Ridge to investigate Jim Sam's concerns.  Michelle Sam advised responding HPD officers that persons inside the residence were smoking marijuana, and that Jordan Williams was kicking her out of the residence because he did not want the police there.  Confirmation by HPD officers of marijuana emanating from the residence, and Michelle Sam's statement that people inside the residence were smoking marijuana, coupled with Williams' prior convictions for possession with intent to sell and possession of a stolen firearm by a convicted person persuaded Detective Purdue that Oustian was telling the truth that Williams had firearms in the residence.

However, although Detective Purdue had an objectively reasonable basis for believing that evidence of possession of marijuana, ecstacy and cocaine might be found in the search premises, the same cannot be said with respect to evidence of distribution of controlled substances.  At most, the warrant relates that Williams was arrested in 2006 for possession with intent to sell and convicted in 2007.  There is no support in the affidavit for the conclusion that he was engaged in a continuing pattern of distribution of marijuana or other controlled substances.  Oustian's information was that he smoked large amounts of marijuana and had smaller amounts of cocaine and ecstacy at the residence, not that he was engaged in sale or distribution.

In this case, Detective Purdue sought and obtained judicial authorization to search for evidence of felon in possession of a firearm, and possession with intent to sell narcotics.  The court has found he had a colorable basis for believing evidence of firearms and related devices, and paperwork related to this offense would be found in the search premises.  His reliance on the search warrant was, therefore, objectively reasonable with respect to evidence of this offense.  The "prime purpose of the exclusionary

1   rule is to deter unlawful police conduct and therefore, effectuate the guarantee of the Fourth

2   Amendment against unreasonable searches and seizures." *Illinois v. Krull*, 480 U.S. 340, 347 (1987)

3   (internal quotation marks omitted).  The exclusionary rule should be restricted to those situations in

4   which its remedial purpose is effectively advanced.  *Id.*  The court should weigh the likely effect of the

5   deterrent effect of the exclusionary rule "against the costs of withholding reliable information from the

6   truth-seeking process." *Id.*

7        The Ninth Circuit has recognized that partial suppression is the proper remedy where evidence

8   is obtained under an over broad warrant.  Under the Ninth Circuit doctrine of severance, the trial court

9   may strike those portions of the warrant that are invalid and preserve those portions that satisfy the

10  Fourth Amendment.  *United States v. Sears,* 411 F.3d 1124, 1129 (9th Cir. 2005).  The doctrine of

11  severance allows the court to suppress only those articles seized pursuant to invalid portions of the

12  warrant.  *Id.*  The Ninth Circuit has allowed severance when a warrant lacked particularity because of

13  some unduly broad language in the warrant.  *Id.*  The warrant in this case was overbroad in seeking

14  evidence of the crime of possession with intent to sell narcotics.  However, Detective Purdue

15  reasonably relied on Judge Burr's determination the warrant stated probable cause to search for and

16  seize firearms, firearm accessories, and related documents showing ownership or possessory interest in

17  them.  Additionally, it is well established that police may search for and seize documents establishing

18  ownership, occupancy or possessory interest in the searched premises.

19        Based on the foregoing,

20        **IT IS ORDERED** that:

21        1.   The government's Motion to Strike (Dkt. #39) is **DENIED**.

22        2.   **IT IS RECOMMENDED** that Williams' Motion to Suppress (Dkt. #27) be

23             **GRANTED in part** and **DENIED in part**.  The motion should be **DENIED** with

24             respect to firearms, firearm accessories, and paperwork showing ownership or

25  ///

26  ///

27  ///

28  ///

possession of these items, and paperwork and other items tending to establish

ownership, occupancy or a possessory interest in the searched premises.  The Motion to

Suppress should be **GRANTED** in all other respects.

Dated this 15th day of October, 2010.


PEGGY A. LEEN
UNITED STATES MAGISTRATE JUDGE